UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY  DIVISION

| | | |
|---|---|---|
| Rose Acre Farms, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 4:09-cv-00135-SEB-WGH |
| vs. | ) | |
| | ) | |
| Columbia Casualty Company and The | ) | |
| National Fire Insurance Company of | ) | |
| Hartford, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PENDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

This cause is before the Court on the parties' cross motions for summary

judgment. [Docket Nos. 29 and 45].  Plaintiff Rose Acre Farms, Inc. ("Rose Acre")

requests partial summary judgment and a finding that Defendants Columbia Casualty

Company ("Columbia") and The National Fire Insurance Company of Hartford

("National Fire") owe it a duty defend pursuant to the insurance policy that Rose Acre

maintained with those entities.  Columbia and National Fire have opposed that motion

and have filed their own request for summary judgment on Rose Acre's claim.  For the

reasons detailed in this entry, Plaintiff's motion is <u>DENIED</u> and Defendants' motion is

<u>GRANTED</u>.

**<u>Factual Background</u>**

Rose Acre produces eggs and egg products and sells them to retailers, distributors,

wholesalers, and marketers throughout the United States.  Miller Decl. ¶ 4. Rose Acre's

main egg producing facilities are located in southern Indiana.  Id.  In August 1999, Rose

Acre entered into an insurance policy with non-party Transcontinental Insurance

Company ("Transcontinental") for the period of March 1, 1999 until March 1, 2000.  Pl.'s

Ex. 1.  As of December 31, 2007, Transcontinental had merged into National Fire and

ceased to exist.  Thus, National Fire is Transcontinental's successor and at issue in this

case is National Fire's obligation to defend Rose Acre pursuant to the Transcontinental

policy.  Rose Acre had an identical insurance policy with Columbia that covered the

period of March 1, 2000 until March 1, 2001.  Thus, our analysis and decision apply with

equal weight with regard to both insurance policies and both Defendants' duties, or lack

thereof, to defend Rose Acre.[1]

In relevant part, the insurance policies stated the following with regard to Rose

Acre's coverage for "personal and advertising injury liability":

1. Insuring Agreement
   a. We will pay those sums that the insured becomes
      legally obligated to pay as damages because of
      "personal and advertising injury" to which this
      insurance applies.  We will have the right and duty to
      defend the insured against any "suit" seeking those
      damages.  However, we will have no duty to defend
      the insured against any "suit" seeking damages for
      "personal and advertising injury" to which this
      insurance does not apply.  We may, at our discretion,
      investigate any offense and settle and claim or "suit"

---

[1]Because the policies that Rose Acre maintained with National Fire and Columbia are identical, we cite only to the former throughout this entry.

2

> that may result.
> . . .
>
> b.    This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.
>
> 2.    Exclusions
>
> This insurance does not apply to:
>
> a.    "Personal and advertising injury":
>
> (1)    Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";
>
> (2)    Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;
>
> (3)    Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;
>
> (4)    Arising out of a criminal act committed by or at the direction of any insured;

Ex. 1 at 4-5 of 13.

The "Definitions" portion of the policy defines "Personal and advertising injury" as follows:

> 14.    ""Personal and advertising injury" means injury . . . arising out of one or more of the following offenses:
> . . . .
> f.    The use of another's advertising idea in your "advertisement"
> . . . .

Pl.'s Ex. 1 at 12 of 13. "Advertisement" is defined as follows:

> 1.    "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.

3

Pl.'s Ex. 1, Transcontinental Policy at 10 of 13.

Beginning in late 2008, numerous plaintiffs began to file class action lawsuits against Rose Acre and other various defendants, alleging they engaged in a conspiracy to raise the price of eggs, thereby damaging the plaintiff purchasers of eggs and egg products.  Miller Decl. ¶ 5.  These class actions were consolidated and transferred to the United States District Court for the Eastern District of Pennsylvania for pre-trial administration and are pending *sub nom. In re: Processed Egg Products Antitrust Litigation*, MDL No. 2002, 08-md-02002, U.S.D.C., E.D. Pa. (hereafter the "*Egg Products Antitrust Litigation*").

Of the 17 complaints brought against Rose Acre as a defendant, some were filed by plaintiffs who purchased eggs and egg products directly from Rose Acre.  These "direct purchaser plaintiffs" filed a Consolidated Amended Class Action Complaint ("Direct Purchaser Complaint") on January 30, 2009.  Pl.'s Ex. 7.  Other complaints were filed by "indirect purchaser plaintiffs ," who filed their Consolidated Amended Class Action Complaint on February 27, 2009.  Pl.'s Ex. 8.  Apart from the identities of the plaintiffs on behalf of whom the two complaints were filed (hereafter, the "Underlying Complaints"), the parties agree that the factual allegations against Rose Acre and other defendants are all substantially the same.[2]  The Underlying Complaints define the Class

---

[2]These two Underlying Complaints contain the only allegations considered by this Court, although Rose Acre's Reply Brief urges us to consider allegations contained in <u>Pilar M. De Castro & Co., Inc. v. Cal-Maine Foods, Inc., et al.</u>, Civil Action No. 2:09-cv-00101-GP, U.S.D.C., E.D. Pa.  We believe to do so would be improper.  As Rose Acre admits, once the

(continued...)

Period as January 1, 2000 through the present.  Pl.'s Ex. 7 ¶ 91, Pl.'s Ex. 8 ¶¶ 110-111.

Rose Acre's co-defendants in the *Egg Products Antitrust Litigation* include the egg trade

organization, United Egg Producers, Inc. ("UEP"), and other individual companies, like

Rose Acre, involved in the egg trade.  As summarized in Paragraph 1 of the Direct

Puchaser Amended Complaint, the plaintiffs allege the following:

> For nearly a decade, Defendants have engaged in a contract, combination
> and conspiracy to fix, raise, maintain, and stabilize the prices at which shell
> eggs and egg products were sold in the United States.  The aim of
> Defendants' conspiracy was to conduct a supply control campaign through
> various means designed to reduce output and artificially fix and/or inflate
> the price of eggs in violation of Section 1 of the Sherman Antitrust Act, 15
> U.S.C. § 1.  Because of Defendants' unlawful conduct, Plaintiffs and
> similarly situated direct purchasers of shell eggs and egg products
> (collectively referred to herein as "eggs") were injured and paid artificially
> inflated prices that were more than they would have paid in a competitive
> market.

Ex. 7 ¶ 1.

Importantly for our purposes, the Underlying Complaints also contain allegations

that a UEP certification program that was purportedly implemented as a result of "animal

husbandry concerns" was actually a "front and pretext for a naked price fixing agreement

and an anticompetitive output restriction scheme."  Ex. 7 ¶¶ 114, 322, 324.

Under the belief that the allegations in the Underlying Complaints implicated its

"personal and advertising injury" coverage under its insurance policies, Rose Acre asserts

---

[2](...continued)
individual cases were consolidated into the Direct Purchaser Amended Complaint and the
Indirect Purchaser Amended Complaint, these Underlying Complaints were the operative
pleadings.  See Pl.'s Mem. ¶¶ 10, 12.

that it sent its insurers notice of three class action complaints that would become part of the *Egg Products Antitrust Litigation* and a request for a defense related to those complaints.[3]  Pl.'s Mem ¶ 14.  Thereafter, Rose Acre continued to notify its insurers of numerous class action complaints naming Rose Acre that were included in the *Egg Products Antitrust Litigation*.

National Fire denied Rose Acre a defense in the *Egg Products Antitrust Litigation*, pursuant to letters dated February 10, 2009 and July 22, 2009.  These letters concluded as follows:

> It is National's position that coverage does not exist for these suits, as the allegations of the suit regarding statutory violation, conspiracy, combination, and unfair competition do not constitute an "occurrence, "as they indicate intent and are not fortuitous in nature.  In addition, the allegations do not fit within the definitions of "bodily injury" or "property damage," as set forth in the policy.  Nor do the allegations fit within any of the enumerated "personal and advertising injury" offenses set forth in the policy.  We further note that coverage would not be available to the extent that the allegations implicate exclusion a., "expected or intended injury," as set forth above.  Finally, claims for restitution of amounts paid for the products in question, statutory treble damages and declaratory relief are not claims for "damages" within the meaning of the subject policy.
>
> For the reasons set out above, National has determined that the National policy provides no coverage for this matter.  National fully reserves and retains all rights that it has under the terms of the policy and under the law.  The above evaluation of coverage is not intended to be exhaustive, and there may be other terms and conditions of the National policy which, although not specifically mentioned in this letter, may apply to this claim. . . .

---

[3]National Fire denies that it received any such notice.  Defs.' Opp. ¶ 14.  However, given their admission of eventual denial of coverage to Rose Acre, this factual dispute is of little or no importance.

6

> By limiting policy references to those cited, National does not waive any
> other policy provisions.  The insurance policies, in their entirety, are
> incorporated by reference as if they had been stated in full and National
> reserves the rights under the policies and applicable law to cite additional
> policy provisions as may be appropriate.

Pl.'s Exs. 10, 11.  As a result of these denials, Rose Acre alleges that it has paid its own

lawyers to defend it in the *Egg Products Antitrust Litigation*.

### Legal Analysis

Rose Acre contends that it is entitled to summary judgment on the issue of whether

National Fire owed it a duty to defend in the *Egg Product Antitrust Litigation,* because

Rose Acre may be found liable for damages arising out of its use of another's advertising

idea in its advertisement, which they assert is covered by the insurance policy.  National

Fire contends that it is entitled to summary judgment on Rose Acre's claim for coverage

because the underlying class action lawsuits arise from alleged violations of the Sherman

Act and similar state statutes, rather than from Rose Acre's advertising activity.  Thus,

National Fire asserts that Rose Acre cannot satisfy its burden of establishing entitlement

to coverage under the advertising injury insurance agreement.  Moreover, National Fire

asserts that any potential coverage would be precluded by operation of the exclusions

included in the policy and because any potential offense would have occurred outside of

the policy periods.

### I.        Standard of Review

Interpretation of written contracts, such as insurance policies, is typically a matter

of law and particularly appropriate for resolution by summary judgment.  Quanta Indem.

Co. v. Davis Homes, LLC, 606 F. Supp. 2d 941, 945 (S.D. Ind. 2009)(J. Barker).

Summary judgment is appropriate when the record shows that there is "no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In

deciding whether genuine issues of material fact exist, the court construes all facts in a

light most favorable to the non-moving party and draws all reasonable inferences in favor

of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Because these are cross-motions for summary judgment and the same Rule 56 standards

apply, our review of the record requires us to draw all inferences in favor of the party

against whom a particular issue in the motion under consideration is asserted.

See O'Regan v. Arbitration Forums, Inc., 246 F.3d 975, 983 (7th Cir. 2001) (citing

Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 692 (7th Cir. 1998)).

## II.      Interpretation of Insurance Contracts Under Indiana Law[4]

The interpretation of an insurance policy is a matter of law. Westfield Companies

v. Knapp, 804 N.E.2d 1270, 1273-74 (Ind. Ct. App. 2004). Insurance contract provisions

are subject to the same rules of construction as other contracts. Id. at 1274. Thus, courts

must construe insurance policies as a whole, rather than considering in isolation

individual words, phrases, or paragraphs. Id. If the contract language is clear and

unambiguous, it should be given its plain and ordinary meaning. Newnam Mfg., Inc. v.

---

[4] The parties agree that Indiana law governs this case.

Transcon. Ins. Co., 871 N.E.2d 396, 401 (Ind. Ct. App. 2007).  Additionally, "[i]nsurance companies are free to limit their liability, so long as they do so in a manner consistent with public policy as reflected by case or statutory law."  Gheae v. Founders Ins. Co., 854 N.E.2d 419, 423 (Ind. Ct. App. 2006).  Thus, "[a]n insurance policy that is unambiguous must be enforced according to its terms, even those terms that limit an insurer's liability."  Amerisure, Inc. v. Wurster Const. Co., Inc., 818 N.E.2d 998, 1002 (Ind. Ct. App. 2004).

Under Indiana law, an insurer's duty to defend is broader than its duty to indemnify.  Walton v. First Am. Title Ins. Co., 844 N.E.2d 143, 146 (Ind. Ct. App. 2006), (trans. denied).  The insured is required to prove that its claims fall within the coverage provision of her policy, but the insurer bears the burden of proving specific exclusions or limitations to policy coverage.  See Erie Ins. Group. v. Sear Corp., 102 F.3d 889, 892 (7th Cir. 1996) (applying Indiana law).  In order to determine whether an insurer has a duty to defend, Indiana courts look to the allegations contained within the complaint, as well as those facts known or ascertainable by the insurer after a reasonable investigation.  Jim Barna Log Sys. Midwest, Inc. v. General Cas. Ins. Co. of Wisconsin, 791 N.E.2d 816, 823 (Ind. Ct. App. 2003).  The complaint's allegations give rise to a duty to defend whenever, if proved true, coverage would attach.  Federal Ins. Co. v. Stroh Brewing Co., 127 F.3d 563, 566 (7th Cir. 1997).  However, "[w]hen an insurer's independent investigations of the facts underlying a complaint against its insured reveals a claim patently outside the risks covered by the policy, the insurer may properly refuse to defend."  Walton, 844 N.E. 2d at 146.

9

### III.     Discussion

As an initial matter, we note that our research has disclosed no Indiana state court to have considered the meaning of "use of another's advertising idea in your 'advertisement.'" However, the predecessor to this offense, "misappropriation of advertising ideas," was considered by the undersigned Judge in Heritage Mut. Ins. Co. v. Advanced Polymer Tech., Inc., 97 F. Supp. 2d 913 (S.D. Ind. 2000)(J. Barker).  In Heritage Mut. Ins. Co., we interpreted the offense of "misappropriation of advertising ideas" to mean "the insured wrongfully took an idea about the solicitation of business." 97 F. Supp. at 926.  Rose Acre asserts that the "use of another's advertising idea" offense should be interpreted to encompass more than its predecessor misappropriation offense. However, even such a broadened interpretation of that offense offers no help to Rose Acre, if the allegations in the Underlying Complaints do not under any possible construct reference such an offense.  See Heritage Mut. Ins. Co., 97 F. Supp. 2d at 918-19 ("[a]n insurer's duty to defend necessarily depends upon the allegations, including the facts alleged . . . .")(citing Federal Ins. Co. v. Stroh Brewing Co., 127 F.3d 563, 566 (7th Cir. 1997) (applying Indiana law).  Thus, we begin our analysis with an examination of the allegations in the Underlying Complaints against Rose Acre.

The Direct Purchaser Amended Complaint contains only one count, namely, a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Pl.'s Ex. 7. The Indirect Purchaser Amended Complaint contains not only a count for violation of the Sherman Act but counts for violations of various state antitrust laws.  Pl.'s Ex. 8.  The gist of the facts

alleged in support of these charges is that Defendants and their co-conspirators "engaged in a continuing contract, combination and conspiracy in unreasonable restraint of interstate trade and commerce . . ., which had the purpose and effect of fixing, raising, maintaining and/or stabilizing the prices of eggs at artificially high, non-competitive levels in the United States."  Ex. 7 ¶ 409; see also Pl.'s Ex. 8, ¶¶ 191-92.  The plaintiffs allege that Rose Acre's "conspiracy" was carried out by the alleged conspirators in the following way: by –

> (a) agreeing to reduce the total number of hens at laying farms in order to decrease overall egg production; (b) agreeing not to replace hens lost through increased cage space requirements; (c) agreeing to manipulate the molting, culling, and disposal of hens to keep egg production low; (d) agreeing not to 'backfill' cages; (e) agreeing to delay or reduce chick hatching; (f) agreeing to reduce inventory; (g) agreeing not to expand or to curtail operations; (h) agreeing to restrain output in the United States; and (l) fixing prices through a horizontal agreement to restrain output."

Pl.'s Ex. 7, ¶ 6; see Pl.'s Ex. 8, ¶ 11.  As a result of the defendants' actions, plaintiffs in both actions allege that they "have been forced to pay supra-competitive prices for eggs and egg products and, as a result of Defendants' illegal actions, have suffered antitrust injury to their property or business."  Pl.'s Ex. 8 ¶ 13; see also  Pl.'s Ex. 7 ¶ 8.

One of the ways that plaintiffs allege that Rose Acre and the other defendants were able to conceal their anticompetitive activity was by falsely representing that the reduced egg supply and higher prices were "as a result of husbandry concerns."  Pl.'s Ex. 7 ¶ 114.  The plaintiffs allege that the UEP created a certification program of "animal husbandry guidelines."  Egg producers who were in compliance with these guidelines were

"permitted to display the UEP Certified logo on their packaging and to market their eggs as 'United Egg Producers Certified.'" Pl.'s Ex. 7 ¶¶ 322-23.  The plaintiffs allege that, in reality, "UEP created the . . . program as a front and pretext for a naked price fixing agreement and an anticompetitive output restriction scheme."  Pl.'s Ex. 7 ¶ 322; see also Pl.'s Ex. 8 ¶ 174.  Neither complaint references any specific advertisement (as that term is defined by the insurance policies at issue or in common usage) related to the UEP certification program on the part of Rose Acre.[5]

In order for Rose Acre to satisfy its burden of proof, it must establish that the underlying complaints against it allege an injury arising out of "the use of another's advertising idea in [Rose Acre's] 'advertisement.'"[6] Pl.'s Ex. 1.  Thus, Rose Acre's argument is that the Underlying Complaints contain allegations that the plaintiffs had suffered injuries arising out of Rose Acre's alleged offense of using the UEP's "advertising idea," namely, that higher egg prices were the result of "animal husbandry guidelines" in Rose Acre's own advertisements.  For the reasons stated below, we are not persuaded by Rose Acre's argument.

---

[5]The Direct Purchaser Amended Complaint does allege that "price increases for shell eggs and egg products before and during the Class Period were not unusual and were publicly reported in filings, press releases, news wire services, trade publications, and newspapers."  Pl.'s Ex. 7 ¶ 109.  But, of course, this allegation does not reference any advertising activity on the part of Rose Acre whereby the purported advertising idea asserted by Rose Acre, i.e. use of the UEP's certification program as an excuse for higher prices, was employed.

[6]The policy actually includes seven potential causes for "personal and advertising injury," covered by the policy.  However, Rose Acre only seeks coverage pursuant to subsection (f) and, thus, that is the only provision that we consider.

First, as noted above, the Underlying Complaints are simply devoid of any reference to any Rose Acre advertisement.[7]  Rose Acre contends that it "used the concern for animal welfare advertising idea on its Internet website," which is an advertisement under Indiana law.[8]  See Hoosier Ins. Co. v. Audiology Foundation of America, 745 N.E. 2d 300, 206 (Ind. Ct. App. 2001).  However, neither Rose Acre's website nor any other broadcast or publication making use of any animal welfare advertising idea is referenced in the Underlying Complaints.  Rose Acre argues that allegations that Rose Acre "sold" and "marketed" its egg products should suffice to establish an advertisement on the part of Rose Acre.  Pl.'s Mem. at 28. However, the fact that Rose Acre advertises its product in general is irrelevant without an allegation that Rose Acre used the advertising idea of another in those advertisements.  The allegations in the complaints that Rose Acre cites in support of its argument, Pl.'s Ex. 7 ¶¶ 43, 47, 323, state as follows:

---

[7]As stated above, the insurance policies define "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters."  Pl.'s Ex. 1.

[8]The internet statement that Rose Acre cites to reads as follows:

> We have farms where the chickens are kept in pens, and farms where the chickens are kept in open-style barns with nests.  There is no nutritional difference between either type of eggs.  Eggs from the "Free-Roaming" farms cost much more than regular eggs because the eggs must be gathered by hand from the individual hen's nest.  All of our chickens, including those kept in pens, are kept in a humane and friendly environment.  Plenty of fresh water, fresh air, and fresh feed are available to each chicken at all times, with plenty of space for each chicken to move about and socialize with the other chickens.  If the chickens are not happy, they will not lay eggs, so it is in our economic best interest to always make sure that all of our chickens are happy and well cared for at all times.

Pl.'s Mem. at 20.

43. Defendant Rose Acre Farms, Inc. ("Rose Acre") is a corporation organized, existing, and doing business under the laws of the State of Indiana, with its offices and principal place of business located in Seymour, Indiana.  During the Class Period, Rose Acre sold eggs and egg products to purchasers in the United States, including members of the Class.

***

47. Rose Acre is a member of UEP and UEA and its employees have served in key executive positions and/or on committees of these organizations on behalf of Rose Acre.  In 2008, Rose Acre employees served on UEP's Area #3, Government Relations Committee, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, Environmental Committee, Producer Committee for Animal Welfare, Public Relations Committee, Long Range Planning Committee, Environmental Scientific Panel, and the United States Egg Marketers Export Committee.  Rose Acre employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.  Rose Acre has participated in and profited from UEP's and its co-conspirators efforts to reduce supply and fix prices, as outlined herein. Rose Acre has agreed to the conspiracy by selling UEP certified eggs and has reduced its egg supply as a result.  Rose Acre has also participated in the conspiracy by exporting shell eggs in order to reduce domestic supplies.

***

323. The UEP Certified program features a trademarked logo which companies can license for a fee.  UEP Certified companies are permitted to display the UEP Certified logo on their packaging and to market their eggs as 'United Egg Producers Certified.' The company may also authorize retail customers to use the logo.  All UEP Certified eggs must also be marketed with the phrase "Produced in Compliance with the United Egg Producers' Animal Husbandry Guidelines."

Pl.'s Ex. 7.   Clearly, these paragraphs excerpted from the complaints contain no

allegations of any Rose Acre advertisement.  Lacking such allegations in the Underlying

Complaints, Defendants have no duty to defend Rose Acre in the *Egg Products Antitrust*

*Litigation*.  While our analysis could stop here, we shall address a few of the parties'

14

other arguments that also support our decision.

Rose Acre contends that the plaintiffs in the *Egg Products Antitrust Litigation* allege that their injury arose out of Rose Acre's use of another's advertising idea in their advertisement.  Defendants rejoin that it was Rose Acre and its co-defendants' conspiracy to inflate egg prices that allegedly caused the plaintiffs' injury.  Defendants have the better side of this dispute because the Underlying Complaints simply do not allege any injury arising out of any advertising activity on the part of Rose Acre.  See e.g., Ex. 7 ¶ 168 (attributing "significantly higher" prices for eggs and egg products to lack of competition), ¶ 392 ("the reduced quantity of shell eggs and resulting supracompetitively increased prices").  Courts in other jurisdictions have reached similar results in cases where insureds have attempted to link anti-trust injuries to coverage for the offense of using another's advertising idea.  See e.g., Trailer Bridge, Inc. v. Illinois National Ins. Co., 2010 U.S. Dist. LEXIS 73970, at * 17-20 (M.D. Fla. July 21, 2010)("it is apparent the underlying plaintiffs allege their injuries were caused by higher prices arising from price-fixing, not from the use of another's advertising idea in [the insured's] advertisement. . . .  It appears the allegations regarding the purported use of the advertising idea were included simply to exemplify the efforts undertaken to hide the price-fixing scheme . . . ."); Champion Laboratories, Inc. v. American Home Assurance Co., 2010 U.S. Dist. LEXIS 65498, at *14-15 (N.D. Ill. June 30, 2010)("the [underlying plaintiffs'] damages arise from the artificial price increases.  As such, the plaintiffs' damages in the underlying lawsuit do not arise out of [the insured] wrongfully taking

defendants' or plaintiffs' advertising ideas.").

Furthermore, we disagree with Rose Acre's contention that the term, idea "of another," could reasonably be interpreted to include ideas of entities other than the claimants in the underlying action.  Although instances of ambiguity in the policy are construed against the insurer, an unambiguous policy must be enforced according to its terms.  See Sans v. Monticello Ins. Co., 676 N.E.2d 1099, 1101-02 (Ind. Ct. App. 1997). Furthermore, as mentioned above, "courts must construe insurance policies as a whole, rather than considering individual words, phrases, or paragraphs."  Knapp, 804 N.E.2d at 1274.  The policy states that the advertising injury must arise out of one of the enumerated "offenses" – in this case, "the use of another's advertising idea in your "advertisement."  We are hard-pressed to understand how use of a co-defendant's idea, as opposed to one of the plaintiffs, could be considered an "offense."  Thus, to adopt Rose Acre's interpretation of the term "of another," the Court would effectively be required to re-write the insurance contract, which (as even Rose Acre concedes) courts are loathe to do.  Kelly v. Hamilton, 816 N.E.2d 1188, 1193-94 (Ind. Ct. App. 2004).

Finally, we note that our research has not uncovered a single case from anywhere in the country where an underlying complaint for antitrust injury triggered an insurer's duty to defend for an advertising injury caused by either "the use of another's advertising idea in your advertisement" or its predecessor offense of "misappropriation of advertising ideas."  This is not to say that such a situation is not theoretically possible.  After all, "[w]hat is important is not the legal label that the plaintiff attaches to the defendant's (that

16

is, the insured's) conduct, but whether that conduct as alleged in the complaint is at least arguably within one or more of the categories of wrongdoing that the policy covers." Curtis-Universal, Inc. v. Sheboygan Emergency Med. Servs., 43 F.3d 1119, 1122 (7th Cir. 1994)(applying Wisconsin law).  However, the lack of any such cases on this point suggests that allegations of advertising injury are not generally viewed by courts or insurance companies or apparently even insureds in a way being argued here by Rose Acre as linked to an anti-trust action.

### Conclusion

For the reasons stated herein, we find that Rose Acre has failed to establish an entitlement to coverage under the advertising injury provision of its insurance policies and, thus, there is no genuine issue of material fact with regard to Defendants' duty to defend Rose Acre.  Rose Acre's Motion for Partial Summary Judgment is therefore DENIED, and Defendants' Motion for Summary Judgment is GRANTED.  Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date:_____02/18/2011_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Christopher R. Carroll
CARROLL MCNULTY & KULL, LLC
ccarroll@cmk.com

Misti Presnell DeVore
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
mdevore@scopelitis.com

Jeffrey D. Featherstun
PLEWS SHADLEY RACHER & BRAUN
jfeather@psrb.com

David A. Gauntlett
GAUNTLETT & ASSOCIATES
info@gauntlettlaw.com

Andrew M. Sussman
GAUNTLETT & ASSOCIATES
ams@gauntlettlaw.com